# In the United States Court of Federal Claims

No. 17-1849C
Filed Under Seal: May 29, 2018
Reissued: June 4, 2018[1]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| | * | |
| **OBXTEK, INC.,** | * | |
| | * | |
| Plaintiff, | * | Denial of Post-Award Bid Protest, |
| | * | *Blue & Gold Fleet, L.P. v. United States,* |
| v. | * | 492 F.3d 1308 (Fed. Cir. 2007); 28 U.S.C. § |
| | * | 1491(b)(4);5 U.S.C. § 706(2)(A); Denial of |
| **THE UNITED STATES,** | * | Permanent Injunction |
| | * | |
| Defendant, | * | |
| | * | |
| and | * | |
| | * | |
| **SALIENT CRGT, INC.** | * | |
| | * | |
| Defendant-Intervenor. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Michelle E. Litteken*, PilieroMazza PLLC, Washington, D.C., for Plaintiff; Of Counsel, *Isaias Alba, IV*, *Kathryn M. Kelley*, *Timothy F. Valley*, PilieroMazza PLLC, Washington, D.C.,

*Michael D. Austin*, Trial Attorney, *Chad A. Readler*, Acting Assistant Attorney General, *Robert E Kirschman, Jr.*, Director, *Douglas K. Mickle*, Assistant Director, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., for Defendant; Of Counsel, *Charles McCarthy*, General Services Administration.

## <u>ORDER AND OPINION</u>

**DAMICH, Senior Judge.**

On November 29, 2017, Plaintiff OBXtek, Inc. ("OBXtek") filed this post-award bid protest challenging the decision of the General Services Administration ("GSA" or "Agency") to deduct 1600 points from OBXtek's self-score in an award of contracts in connection with the Alliant 2 government-wide acquisition contract ("GWAC") under Request for Proposals No.

---

[1] The parties were directed to submit any redactions; they agreed that no redactions were necessary.

QTA0016JCA003 ("The RFP" or "Solicitation").[2]  The GWAC is a Multiple Award, Indefinite Delivery, Indefinite Quantity (IDIQ) contract to provide information technology ("IT") services to a wide variety of federal agencies.  In its protest, OBXtek alleges that (1) GSA wrongfully deducted 1000 points from its self-score because it did not provide a verification form under the Project Service Code Group relevant experience and (2) GSA wrongfully deducted 600 points from its self-score because there was no requirement to submit an interim report for Leading Edge Technology projects with less than one year of project performance.  But for GSA's errors in the evaluation, OBXtek contends it would have been selected for award.  After receiving the Administrative Record, OBXtek filed an Amended Complaint on February 2, 2018, adding its allegation that GSA conducted unequal discussions.  For these reasons, OBXtek argues that the award decision was arbitrary, capricious, and contrary to law, and requests this Court to enter a permanent injunction.

A protective order was entered on December 6, 2017, and on the same date, the Court adopted the litigation schedule as provided by the parties.  On January 19, 2018, the Administrative Record was timely filed pursuant to the schedule.

On January 31, 2018, Salient CRGT, Inc., filed a motion to intervene which was subsequently granted on February 1, 2018.[3]

OBXtek filed its motion for judgment on the administrative record on February 9, 2018, in compliance with the parties agreed to scheduling order ("Pl. Mot.").  On March 5, 2018, defendant filed its response and cross-motion for judgment on the administrative record ("Def. Resp.").  On March 16, 2018 and March 30, 2018, the parties timely filed their responses and replies.

After careful consideration and for the reasons set forth below the Court **DENIES** OBXtek's motion for judgment on the administrative record and **GRANTS** defendant's cross motion for judgment on the administrative record.

I.      Facts

    A.  The Solicitation

---

[2] Five other related bid protests were also filed this in court and assigned to the undersigned.  *See Centech Group, Inc., v. United States*, Case No. 17-2031C; *Octo Consulting Group, Inc., v. United States*, Case No. 17-2056C; *Capgemini Gov't. Solutions LLC v. United States*, Case No. 18-3C; *Harris IT Services Corp. v. United States*, Case No. 18-24C; and *Dynetics, Inc., v. United States*, Case No. 18-481C.  Two of them have since been voluntarily withdrawn.  *See Harris IT Services Corp. v. United States*, Case No. 18-24C at ECF No. 17; *Capgemini Gov't. Solutions LLC v. United States*, Case No. 18-3C at ECF No. 47.

[3] Defendant-Intervenor did not participate in the briefing.

GSA first published notice of its intent to procure under the RFP in FedBizOps in January 2014. AR at 1. GSA made its first draft RFP public in March 2015, AR at 412, and had received more than 900 comments regarding draft RFPs by December 2015. AR at 1891.

On June 24, 2016, GSA issued the RFP. AR at 1887. The RFP provided for a 5-year base period, one 5-year option period, and a total ceiling value of $50 billion for all task orders. AR at 1386, 1334. The RFP further provided that GSA would issue multiple awards to the top sixty highest-rated offerors on a best-value bases to "the highest technically rated offerors with a fair and reasonable price." AR at 1581-82. Offerors were to self-score their proposals in the following categories: relevant experience; past performance; systems, certifications, and clearance; and organizational risk assessment. AR at 1517-80. GSA would then verify the scoring during proposal evaluation. AR at 1582. Based on the offeror's answers, the scoring worksheet auto-calculated its score out of a possible 83,100 points. AR at 30306. In the event of a tied score, "all Offerors precisely tied at the 60th position [would] receive an award." AR at 1582. The awardees would then be permitted to bid on a series of fixed-price, cost reimbursement, time-and-materials, and labor-hour task orders to provide IT services to various federal agencies. AR at 1333.

Relevant to this protest are the evaluations under Project Service Code ("PSC") Group Projects, Leading Edge Technology ("LET") Relevant Experience Projects, and the Individual Subcontracting Plan ("subcontracting plan").

## 1. PSC Group Relevant Experience

Offerors could possibly earn a total of 17,000 points for experience under traditional information technology projects, known as PSC Group Projects, RFP Section 5.2.2. AR at 2264. In order to score these points, offerors were required to submit verification documents under two methods, depending on the information available. AR at 1543-44.

RFP section L.5.2.2.1.1 provided the two methods of verifying relevant experience: (1) a Federal Procurement Data System report ("FPDS Report"), combined with the statement of work, as verification, or (2) if an FPDS Report was either not available, incomplete, or inaccurate, an offeror could submit the J.P-2 form describing the project and signed by the project's contracting officer, corporate officer, or local official, a copy of the contract award document and any modifications, a copy of the contract statement of work, and, if applicable, documentation of the contract line items. AR at 1543-44. Simply put, an FPDS Report was required if possible; if it was not possible, then the J.P-2 form option with the contracting officer's signature was an available option in order to gain the base points for PSC experience.

In addition to the possible 17,000 PSC project points, an offeror could earn an additional 500 points, per project, if an offeror could establish that the contract was of a particular size or complexity. AR 1673-74. This required that an offeror establish that the contract was either a multiple-agency award or a cost-reimbursement-type contract for each separate federal customer. AR at 1548-49. To verify the distinct sources of federal funding, RFP Sections L.5.2.2.2, L.5.2.2.3, and L.5.2.2.4 explicitly required the submission of an FPDS Report to award these points, *unlike the base points for the underlying PSC experience*. AR at 1547-48 (emphasis

added).  In other words, offerors had the option of the two methods of verifying relevant experience to earn base points, but in order to gain additional points the FPDS Report was required.

Specific to this protest is RFP Section L.5.2.2.3, "PSC Group Relevant Experience – Demonstrating Experience with Multiple Federal Government Customers," which provided in pertinent part:

> This additional scoring is only available for relevant experience projects performed as a prime contractor to the Federal Government.
>
> Federal Government Customer is determined by the Funding Agency ID identified within the FPDS Report . . .
>
> Verification must also be provided by attaching the FPDS Report that indicates the claimed Funding Agency ID.

AR at 1548.

Additionally, in a published answer and question session, a prospective bidder asked and the contracting officer responded to this provision, "[h]ow can we obtain credit from a unique funding source that does not have an FPDS Report or a Funding Agency ID?  The Document Verification and Scoring Sheet only gives credit for unique Funding Agency IDs."  AR at 1932. In its published response the GSA responded, "[t]hat is correct. You must have an FPDS specifying the funding agency code.  No exceptions."  AR at 1932.

## 2.  LET Relevant Experience Projects

Offerors could also earn points for Leading Edge Technology experience.  AR at 2264. Under the potential ten types of LETs, each offeror could earn points for three occurrences (referred to as projects) for up to 600 points (100 points for the first occurrence, 200 for the second, and 300 for the third) under each of the ten categories.[4]  AR at 1675.

Section L.5.2.3, "Leading Edge Technology Relevant Experience," provided in pertinent part:

> 4. Each Leading Edge Technology Relevant Experience Project must be Ongoing or have been Completed within 5 years from the date proposals are due. (Completed is within 5 years from the proposal's original submission date, 29 August 2016; and an Ongoing status can be at the proposal's original

---

[4] The ten categories are: (1) artificial intelligence; (2) autonomic computing; (3) big data; (4) biometrics; (5) cloud computing; (6) cyber security; (7) health IT; (8) mobile IT; (9) the internet of things; and (10) virtual networking.  AR at 1559.

or the extended submission date). **Each project must have at least one year of performance** unless one of the following situations exist:

> a. The project has an Interim or a Final CPARS/PPIRS.[5]
> b. The project has a completed Award Fee Determination.
> c. The project had a base period of performance less than one year and that period of performance is Completed.

**DEFINITION**: For purposes of this section L.5.2.3, the words "Ongoing" is defined as a Project that has not yet been "Completed" by the proposal's **original** submission date (29 August 2016), **or by the proposal's extended submission date ONLY if the Ongoing project has at least one full-year of performance. Otherwise, if less than one-year performance, one of the three situations must exist, noted above in *L.5.2.3, item #4 . . .***

AR at 1554 (emphasis in the original).

### 3.  Subcontracting Plans

The RFP further required other than small business offerors to submit an Individual Subcontracting Plan.  AR at 1518.  Section M.4.2 set forth the evaluation criteria for the subcontracting plan.  In relevant part it provided:

> **M.4.2 The Offeror's Individual Subcontracting Plan (Plan) must be determined Acceptable**
> *The Plan is a material requirement of the proposal for an other than small business Offerors.*
> The Offeror's Plan must be determined <u>Acceptable</u> in order to be eligible for award.  The Offeror's Plan will be evaluated on an ACCEPTABLE / UNACCEPTABLE basis and a **Responsibility Determination** factor[.]

AR at 1585 (emphasis in the original).

### B.  Pre-Award and GAO Protests

Eight protests[6] were filed before the Government Accountability Office ("GAO") before the deadline for proposals and two were filed with the Agency.  AR at 2297-2772.  Out of the ten protests, two protests challenged the RFP requirement that an offeror submit an FPDS Report in order to gain bonus points for work performed.  Four others challenged the price evaluation scheme.  All protests were denied.  AR at 2760-61.

---

[5] A Contractor Performance Assessment Report System ("CPARS") report is a performance report created by government personnel for a contractor's performance on a given project.  https://www.cpars.gov.  The Past Performance Information Retrieval System ("PPIRS") is the Federal repository for completed CPARS.  https://www.ppirs.gov.

[6] One protest was voluntarily withdrawn after GSA took corrective action.  AR at 2305.

### C.  Proposal Submission, Evaluation, and Award

OBXtek timely filed its proposal in response to the RFP, along with 169 other offerors. AR at 30306.  The Source Selection Evaluation Team ("SSET") performed a technical evaluation of the 170 offers, selecting the top 61 rated proposed for price evaluation.  After the proposals were submitted, GSA informed at least five offerors that their subcontracting plans were unacceptable or contained deficiencies and requested revisions of the plans.  AR at 30410-56; 30501-25.  GSA did not identify a need to conduct clarifications to offerors with respect to PSC Groups and LET experiences.  AR at 30324.  Ultimately, GSA awarded contracts to 61 offerors, with scores ranging from 83,100 to 73,600.  AR at 30306.

### D.  OBXtek's Notification and Debriefing

On November 17, 2017, GSA notified OBXtek that it had not been selected for award. AR at 30537.  GSA informed OBXtek that it deducted 1,900 points from its self-score of 74,400, resulting in a total evaluated score of 72,500.  AR at 30544-46.

GSA awarded OBXtek 17,000 points for PSC Group relevant experience, the maximum amount available for this aspect of the evaluation.  OBXtek claimed 3,500 additional points in its self-score for experience with multiple federal government customers.  However, GSA deducted a total of 1,000 points stating:

> [i]n accordance with RFP Sec. L.5.2.2.3 PSC Group Relevant Experience - Demonstrating Experience with Multiple Federal Government Customers, the Federal Government Customer is determined by the Funding Agency ID identified within the FPDS Report.  In order to gain points in this area, the offeror is required to provide an FPDS report.  **Here, the Offeror failed to provide a FPDS report in connection with these two PSCs.**

AR at 30538 (emphasis added).

For its LET experience, OBXtek claimed 3,600 points in its self-score.  Here, GSA deducted 600 points from OBXtek's self-score, explaining:

> The SSET evaluated OBXtek Inc., proposal and determined that Leading Edge Technology (LET) Relevant Experience **Projects 3-3 and 10-3 were disallowed due to the fact that the projects did not have 1 year period of performance and did not meet any of the exceptions . . .**
>
> Accordingly, the evaluation team deducted 300 points for LET 3-3 and 300 points for LET 10-3 for a total of 600 points.

AR at 30539 (emphasis added).

### II.     Jurisdiction and Standard of Review

The Court has jurisdiction under the Tucker Act, 28 U.S.C. section 1491(b)(1).  The Tucker Act, as amended by the Administrative Disputes Resolution Act of 1996, 28 U.S.C. section 1491(b)(1), grants this Court exclusive jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal Agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or proposed procurement."  28 U.S.C. § 1491(b)(1).  Under the Tucker Act, an "interested party" includes an actual or prospective offeror whose direct economic interest would be affected by or which has suffered a non-trivial competitive injury or prejudice as a result of the alleged error.  *Sys. Application & Tech., Inc. v. United States*, 691 F.3d 1374, 1382 (Fed. Cir. 2012).

In a bid protest, the trial court "review[s] the agency's decision pursuant to the standards set forth in section 706 of Title 5," the Administrative Procedure Act ("APA").  28 U.S.C. § 1491(b)(4); *see Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Pursuant to the standards set forth in the APA, the trial court determines whether the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706.  A procurement decision may be set aside "if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations omitted).  Further, a protester must demonstrate that there was a substantial chance it would have received the contract award, but for the alleged error in the procurement process.  *Statistica Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996).

## III.   Discussion

OBXtek raises three separate bases for this protest.  Specifically, OBXtek alleges that: (1) GSA wrongfully deducted 1000 points from its self-score under the PSC group, (2) GSA wrongfully deducted 600 points under the LET category, and (3) GSA engaged in unequal discussions.  The Court will take each in sequence.

### A.  Group Relevant Experience - Demonstrating Experience with Multiple Federal Government Customers Under RFP Section L.5.2.2.3 PSC: GSA's Bonus Point Deduction was Reasonable.

OBXtek alleges that it is protesting the Agency's evaluation as it was "unreasonable and inconsistent with the Solicitation."  Pl. Mot. at 20.  OBXtek argues that the Agency unreasonably deducted 1,000 multiple-agency bonus points because OBXtek "did not provide FPDS Reports for two of its seven projects that it submitted to demonstrate its experience with multiple federal customers."  *Id.*; AR at 30538-39, AR 29880-81.  Because OBXtek captured all 17,000 points under PSC experience, it argues that it should have been awarded all of its claimed additional points – 3,500 – without the 1,000 point deduction for the two projects that did not contain an FPDS Report.  Pl. Mot. at 21.

OBXtek relies on section L.5.2.2.1.1 of the RFP which provided that an offeror had two choices for project verification – a choice of either (1) filing an FPDS Report (L.5.2.2.1.1(1)),  or

if not available or accurate, by (2) submitting a contracting officer's signature (L.5.2.2.1.1(2)). OBXtek argues that by choosing the alternate method – L.5.2.2.1.1(2) – in lieu of an FPDS Report – L.5.2.2.1.1 – it should have been credited with the additional points.  In support of this argument, OBXtek compares the verification Section of L.5.2.2.3 with L.5.2.2.4.  Specifically, RFP section L.5.2.2.3 provided in relevant part:

> This additional scoring is only available for relevant experience projects performed as a prime contractor to the Federal Government.
>
> Federal Government Customer is determined by the Funding Agency ID identified within the FPDS Report. . .
>
> Verification must also be provided by attaching the FPDS Report that indicates the claimed Funding Agency ID.

AR at 1548.

In comparison, section L.5.2.2.4 states:

> Verification must also **must be** provided by attaching the FPDS-NG Report that indicates a cost-reimbursement contract type. The verification method mentioned in *Section L.5.2.2.1.1(2)* shall not apply to this Section L.5.2.2.4. **An attached FPDS-NG Report verifying the submitted cost-type project is required for earing points in this section.**

AR at 1549 (emphasis in the original).  Therefore, because section L.5.2.2.3 does not specifically include the language, "Section L.5.2.2.1.1(2) shall not apply[,]" OBXtek claims that section L.5.2.2.1.1(2) verification (not requiring an FPDS Report only a contracting officer's signature) is available to capture the additional points under section L.5.2.2.3.

Here, unlike the base project points, which provided two options to capture points without an FPDS Report, AR at 1544-47, the RFP explicitly required an FPDS Report to capture the additional points.  *See* AR at 1548-49 ("Verification must also be provided by attaching the FPDS report . . . .").  Furthermore, when asked during proposal preparation how an offeror could obtain credit from a unique funding source that does not have an FPDS Report of Funding Agency ID, the Agency replied unequivocally that an offeror must provide "an FPDS specifying the funding agency code.  No exceptions."  AR at 1932.

Moreover, this RFP provision was subject to a pre-award protest at GAO, with the GAO finding that:

> [T]he record supports the agency's position that assigning points to firms that can provide a FPDS report is reasonably related to the agency's needs . . .

Given that the acquisitions that will take place under the Alliant 2 GWAC
are acquisitions that will be competed, awarded, and performed under the
FAR, we find nothing objectionable with an RFP provision that provides an
evaluation preference to contracts that were performed under the FAR.

AR at 2576, 2580-81.

Therefore, it is clear that the requirement for an FPDS Report was made explicit on the
face of the RFP.  It is further clear that when asked, the Agency was specific that an FPDS
Report was required to gain the additional points.  And lastly, the GAO pre-award protest
determined that assigning points to firms that could provide an FPDS Report was reasonably
related to the Agency's needs.  Thus, when the Agency evaluated OBXtek's PSC projects for the
possibility of capturing additional points, the Agency did exactly what it told the offerors it
would do: that in the absence of an FPDS Report, the Agency would decline to award the
multiple bonus points.  Here, the two projects that were deducted did not have an FPDS Report,
as required.  Therefore, the Agency's evaluation deducting 1000 points was reasonable and in
accordance with the Solicitation.

**B.  Leading Edge Technology Relevant Experience Under RFP Section
L.5.2.3: GSA's Point Deduction was Reasonable.**

GSA deducted 600 points from OBXtek's self-score because two of its LET project
submissions (LETs 3-3 and 10-3) failed to meet the RFP's requirement of at least one-year of
performance and did not otherwise qualify under the RFP's stated exceptions to this rule.
Section L.5.2.3 Leading Edge Technology Relevant Experience provided, in pertinent part:

4 . . . . **Each project must have at least one year of performance** unless
one of the following situations exist:

a. The project has an Interim or a Final CPARS/PPIRS.
b. The project has a completed Award Fee Determination.
c. The project had a base period of performance less than one year and
that period of performance is Completed.

AR at 1554.

In its evaluation, GSA noted the dates of the two projects in question—for LET 3-3, the
period of performance is 01 February 2016 through 31 January 2021, and for LET 10-3, the
period of performance is 01 April 2016 through 31 March 2021— both outside the "one year"
rule.  GSA then found that these two projects did not meet any of the above exceptions.

OBXtek concedes that the two projects did not meet the above requirement for one year
of performance.  Pl. Mot. at 24.  OBXtek also does not argue with the requirement that the
projects have an "Interim or Final CPARS/PPIRS."  Rather, OBXtek contends that Section
L.5.2.3 did not require the *submission* of verification, that is, of the Interim or Final
CPARS/PPIRS.  In its own words: "nothing in the Solicitation reasonably notified offerors that

submitting CPARS/PPIRS was a requirement in order for projects to qualify for the exception." *Id*. at 25.  Therefore, OBXtek contends that its conclusion that no documentation was needed was reasonable and that the deductions were inconsistent with the terms of the RFP and/or the result of a latent ambiguity in the RFP.  *Id*. at 26; Pl. Reply at 15-18.

"A latent ambiguity is a hidden or concealed defect which is not apparent on the face of the document, could not be discovered by reasonable and customary care, and is not so patent and glaring as to impose an affirmative duty on plaintiff to seek clarification." *Analytical & Research Tech., Inc. v. United States*, 39 Fed. Cl. 34, 46 (1997).  On the other hand, "[a] patent ambiguity is present when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties." *Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1381 (Fed. Cir. 2000).

A plaintiff who "has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007).  A party's failure to do so is a waiver of its ability to raise the same objection in a bid protest action in this Court.  *Id*. at 1313.  "This doctrine was established to prevent contractors from taking advantage of the government, protect other bidders by assuring that all bidders bid on the same specifications, and materially aid the administration of government contracts by requiring that ambiguities be raised before the contract is bid, thus avoiding costly litigation after the fact." *Id*. at 1313-14 (citing *Cmty. Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1580 (Fed. Cir. 1993)).

In arguing that the Solicitation contained a latent ambiguity, OBXtek contends that no affirmative duty was imposed on it to seek clarification and its interpretation allowed it to meet the requirements without submitting the reports.  Specifically, OBXtek contends that because other sections of the RFP contained explicit verification requirements, and as this section was silent with regard to verification requirements, OBXtek was not required to submit any verifying reports or documents in order to capture the points.  Pl. Mot. at 37.  This Court, however, interprets the inconsistency entirely differently: because the RFP was explicit in other sections requiring the submission of forms, *i.e.* J.P-3 Form, FPDS Report, AR at 1523, 1594.  OBXtek was placed on notice of the ambiguity in this section which should have prompted it to rectify the inconsistency prior to submitting its bid.  The inconsistency—explicit verification requirements versus no explicit verification requirement—consequently amounts to a patent ambiguity.  As a patent ambiguity, the challenge was required pre-award.  *Blue & Gold Fleet,* 492 F.3d 1318.

Furthermore, regardless of the patent/latent ambiguity argument, OBXtek could not have complied with the requirement in any event, as an interim CPARS/PPIRS did not exist at the time of proposal submission.[7]

_____

[7] OBXtek argues that even though its proposal did not contain any information which might qualify those LETs under an exception, a CPAR/PPIRS exists and should have been

Finally, although section L.5.2.3 did not expressly require submission of verification, it did so by clear implication. How could the Agency have verified that OBXtek's projects fit into one of the exceptions without any documentation, unless it did the research itself—a burden that the Agency was unlikely to assume? Thus, it is only logical that verification was required and, therefore, the deductions were consistent with the RFP. The Agency's deductions were therefore reasonable.

### C. GSA Treated All Equally

"The acid test for deciding whether an agency has engaged in discussions is whether the agency has provided an opportunity for quotations or proposals to be revised or modified." *Consol. Eng'g Servs., Inc. v. United States*, 64 Fed. Cl. 617, 626 (2005) (citations omitted). "If the agency decides to award the contract after holding discussions, it must hold discussions with all responsible offerors within the competitive range." *Id.* (citations omitted).

In this case, it is uncontested that after the proposals were submitted, GSA requested at least five offerors to revise their subcontracting plans. The GSA letter requesting additional information plainly stated that their "plans were unacceptable." AR at 30410-56; 30501-25. Thus, it is OBXtek's contention that because the solicitation required that the subcontracting plan be rated acceptable for the offeror to be eligible for award, but for the discussions, many of the offerors would have been ineligible to receive the award. Pl. Reply at 6; *see also* AR at 1585 ("[t]he Offeror's Plan must be determined <u>Acceptable</u> in order to be eligible for award. The Offeror's Plan will be evaluated on an ACCEPTABLE / UNACCEPTABLE basis and a **Responsibility Determination factor**[.]**")** (emphasis in the original). Simply put, OBXtek alleges that once GSA submitted comments to the various offerors on their subcontracting plans, and then permitted these offerors to incorporate those comments into revised subcontracting plans, discussions were triggered. Once discussions were trigged, OBXtek claims that it should then have been permitted to revise and correct any deficiencies within its proposal.

In addition, OBXtek argues that the Agency can avoid its obligations under the Federal Acquisition Regulation ("FAR") simply by labeling an evaluation criterion as part of the responsibility determination. Pl. Reply at 11. By doing so, OBXtek contends that an agency can avoid its obligations under the FAR simply by labeling an evaluation criterion as part of the responsibility determination. *Id.* Moreover, OBXtek argues that the "Defendant has not cited a single case in which this Court has held that a subcontracting plan was part of a responsibility determination and, therefore, not subject to the regulations governing discussions." Pl. Reply at

---

located by GSA. Pl. Reply 17-18. Therefore, according to OBXtek, both projects qualify for points under exception (a). However, the Court cannot find any evidence from OBXtek that these interim CPARS reports existed at the time of proposal submission. *See generally* Pl. Mot. and Pl. Reply. Instead, defendant responds that the reports, which the government evaluators located in the CPARS system during the course of this litigation, are dated some eight months after the proposal deadline had passed. The relevant interim CPARS records indicate that they were created in May and June of 2017, long after the solicitation closing date. Def. Reply at 9-10.

8. This statement is untrue, *see* Def. Br. at 12, and as the cases hold that subcontracting plans are properly part of a responsibility determination, the Court will begin here.

In *Consolidated Engineering*, the plaintiff alleged that the agency failed to conduct equal and meaningful discussions when the agency requested that the apparently successful offeror revise its subcontracting plan. *Consol. Eng'g Servs.*, 64 Fed. Cl. at 626. Like OBXtek, the plaintiff in *Consolidated Engineering* argued that once the agency submitted comments to an offeror on its subcontracting plan and permitted that offeror to incorporate those comments into a revised subcontracting plan, discussions were triggered and the plaintiff was entitled to revise its proposal and correct any deficiencies therein. *Id.* at 627. The Court did not agree. Instead, quoting the FAR, the Court noted:

> FAR § 19.702(a)(1) provides that a subcontracting plan shall be required from the "apparently successful offeror," and states that said offeror shall be ineligible for award "[i]f the apparently successful offeror fails to negotiate a subcontracting plan acceptable to the contracting officer within the time limit prescribed by the contracting officer. FAR § 19.702(a)(1). Furthermore, FAR § 19.705–4 sets forth the additional requirement that "[t]he contracting officer must review the subcontracting plan. . . . and provides this instruction: In determining the acceptability of a proposed subcontracting plan, the contracting officer should take the following actions: . . .(7) Obtain advice and recommendations from the SBA procurements center representative (if any) and the agency small business specialist. FAR § 19.705–4(d).

*Id.* Therefore, relying on the FAR, the Court concluded that an agency's actions in requesting a subcontracting plan and negotiating with a bidder to ensure that the subcontracting plan was acceptable "was not only contemplated by the FAR, but required by it." *Id.* The Court further held that "subcontracting plan[s] relate[] to an offeror's responsibility, even where the solicitation requests the offeror submit the plan with its proposal." *Id.* at 627 (internal quotations omitted).

In *Dyncorp Int'l LLC v. United States,* 76 Fed. Cl. 528 (2007), this Court also held that that exchanges between an agency and offerors regarding responsibility determinations, including the analysis of the subcontracting plan, do not constitute discussions under FAR 15.306(d). *Id.* at 546-547. In this instance, the Court held, "[t]his court has approvingly cited GAO cases stating this rule to support a holding that exchanges concerning an element of responsibility such as a subcontractor plan do not constitute discussions." *Id.* (citing *Consol. Eng'g Servs.*, 64 Fed. Cl. 627; *Kahn Instruments, Inc.,* B–277973, 98–1 CPD ¶ 11, 1997 WL 811931 (Comp. Gen. Dec. 15, 1997); *A.B. Dick Co.,* B–233142, 89–1 CPD ¶ 106).

Applying the same reasoning, the Court holds that the GSA's communications regarding the subcontracting plans do not amount to discussions because the communications only concerned responsibility. Responsibility relates to the offeror's capability or ability to perform a contract. Responsiveness, by contrast, relates directly to the contractor's ability to provide the goods or services being procured. *Heli-Jet Corp. v. United States* 2 Cl. Ct. 613, 620 (1983). Thus, communications based on a responsibility determination in accordance with the FAR, does

not open up discussions for other areas to include those related to responsiveness.  Accordingly, the Agency acted properly when it did not allow OBXtek to revise its proposal with regard to the PSC and LET scores.

### D.  Denial of Permanent Injunctive Relief

In order to establish that it is entitled to permanent injunctive relief, the plaintiff must establish actual success on the merits.  The foregoing analysis reveals that there is no basis upon which to grant OBXtek's motion for judgment on the administrative record.  As such, OBXtek has failed to establish an entitlement to injunctive relief, *i.e.,* it has failed to show actual success on the merits.

### E.  Conclusion

For all the foregoing reasons, OBXtek's motion for judgment on the administrative record is **DENIED** and defendant's cross motion for judgment on the administrative record is **GRANTED**.  The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

s/Edward J. Damich
EDWARD J. DAMICH
Senior Judge

13